## AFFIDAVIT OF PETER MILLIGAN

I, Peter Milligan, having been duly sworn, do hereby depose and state:

1. I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been employed as an ATF Special Agent since April 2009 and I am currently assigned to the Boston Group VI Field Office. As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by felons and other prohibited persons, and the use of firearms in drug trafficking and violent crimes, as well as the investigation of laws related to explosives violations and incendiary (arson) fires. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. I have participated in numerous classes of in-service training relating to firearms trafficking investigations and arson and explosives investigations. I have been the affiant and/or participated in the execution of numerous state and federal search and arrest warrants pertaining to violations of the federal firearms, narcotics, arson, and explosives laws.

2. Based on my training and experience as an ATF Special Agent, I know that it is a violation of 18 U.S.C. §922(a)(1)(A)

for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce. I also know that that it is a violation of 18 U.S.C. §371 any person, except a licensed importer, licensed manufacturer, or licensed dealer to conspire to deal in guns without a license.

3. I submit this affidavit in support of a criminal complaint charging **JOSE ILARRAZA, A/K/A "KAE-KAE,"** (hereinafter referred to as **"KAE-KAE"**) **BRYAN TORRES-ALMANZAR, A/K/A "FLEX,"** (hereinafter referred to as **"FLEX"**) and **ERIC VALENTIN, A/K/A "JEFE"** (hereinafter referred to as **"JEFE"**)[1] with engaging in the business of dealing in firearms without being licensed, conspiracy to deal in firearms without a license, and aiding and abetting in violation of 18 U.S.C. §§ 2, 371, and 922(a)(1)(A). The object of that conspiracy was to deal in guns without a license and the Targets made all of the sales described below in furtherance of that objective.

4. The facts stated herein are based upon my own personal involvement in this investigation and my discussion with other

---

[1] Throughout this affidavit, **"KAE-KAE," "FLEX,"** and "**JEFE'** will collectively be referred to as "the Targets".

law enforcement officers involved in this investigation.  In submitting this affidavit, however, I have not included every fact known to me about the investigation, but only those facts, which I believe, are sufficient to establish the requisite probable cause.

### A. The initiation of ATF's investigation into the Targets' gun trafficking

5.   On September 11, 2017, I received information that originated from an ATF Cooperating Witness ("CW-1") regarding firearms that might be available for sale through an individual named **FLEX**.[2]  CW-1 was approached by an individual named **KAE-KAE** who had heard that CW-1 was interested in obtaining firearms so that they could be sent to the Dominican Republic.  **KAE-KAE** advised to contact **FLEX** (who **KAE-KAE** advised was heavily involved in firearms trafficking and would be able to supply

---

2 CW-1 is in the United States illegally.  Approximately ten and a half years ago, he/she admitted to sufficient facts in Massachusetts State Court for Possessing Class A and Class B Substances with Intent to Distribute and the case was continued without a finding. More recently, a motion for new trial was allowed and that case remains pending. CW-1 also has two convictions for entering the United States illegally, has been deported four times, and is awaiting sentencing on his/her current illegal reentry case. CW-1 also has a pending case in state court for possessing a forged RMV document and giving a false address. CW-1 is cooperating with law enforcement in the hopes of obtaining assistance on immigration issues and on his/her pending cases. Information that CW-1 provided was corroborated by statements made by one or more of the defendants during the gun buys and/or during taped telephone conversations.

3

whatever CW-1 wanted) at (603)718-4267 and to tell **FLEX** that he was calling for **KAE-KAE** (**ILARRAZA**) and that **FLEX** (**TORRES-ALMANZAR**) would be expecting the call. CW-1 also indicated that **FLEX** was selling two firearms (one was described as a .380 and the other as a 9mm) for $700 each and that half the money should be deposited in **ILARRAZA**'s canteen account at the Essex County Jail with the other half to be paid to **FLEX** upon delivery of the guns. This information was transmitted to law enforcement through another cooperator ("CW-3") at the request of CW-1.

6. I then provided this information to a second ATF Cooperating Witness ("CW-2") who we planned to use to purchase guns from **FLEX** and anyone working with him.[3] Based on the information presently available to us, the involvement of **KAE-KAE** (who is presently incarcerated in state custody) was steering the CW-1 (and ultimately CW-2) to **FLEX** as a customer for guns. According to statements made by **FLEX** on September 14, **KAE-KAE** was in the process of "growing their organization" when

---

3 CW-2 is an individual who is cooperating with the ATF for money. CW-2 has a limited criminal history that includes six adult arraignments, all of which were dismissed except for a case for operating after suspension that was continued without a finding and then dismissed. As a juvenile, CW-2 had five arraignments, all of which were dismissed. The information provided by CW-2 has been corroborated both by observations made during the gun buys described below and from a review of the audio and video recordings made on every buy.

he was incarcerated on state charges of Breaking and Entering and Resisting Arrest.

7.  CW-2 made the first of a number of calls to **FLEX** late in the morning on September 12, 2017.  Initially, **FLEX** led CW-2 to understand that he/she would sell both guns for $900.  However, in a later conversation, **FLEX** indicated that the price for the guns was $700 each and that one-half of the purchase price ($700) would have to be deposited in **ILARRAZA**'s Canteen Account at the Essex County Jail.  I deposited that money into **ILARRAZA's** account at the jail on September 13 and provided a copy of the money order to CW-2 who texted it to **FLEX** so that he would know that the money had been deposited for **KAE-KAE** as directed.

**B.** *Buy 1*--<u>**The September 13, 2017 Purchase of a SCCY Industries Model CPX-1 9mm semiautomatic handgun that had an obliterated serial number**</u>

8.  Late in the afternoon of September 13, 2017, I and other agents met with CW-2 so that he/she could arrange to pick up what he/she believed to be two firearms (one of which had already been paid for by depositing the $700 into **ILARRAZA**'s jail canteen account).  Once advised that the requested deposit had been paid, **FLEX** agreed to meet at the Market Basket at 1201 Bridge Street in Lowell.  CW-2 was thereafter provided with $700 (to pay for the second gun we believed the CW would be picking

5

up), recording equipment, and an undercover car equipped with additional recording equipment. After CW-2 and the car were searched, he/she was followed as he/she left the staging area at approximately 4:46pm to meet with Flex and pick up the gun.

9.   While CW-2 was on route to the meeting, he/she spoke with **FLEX**. **FLEX** told CW-2 that he was at the McDonald's across the street from the Market Basket and that he would be walking the parking lot when CW-2 arrived so that he could "feel" CW-2 out.

10.   CW-2 arrived at 1201 Bridge Street at approximately 5:00pm and was met by three men standing in the parking lot. Two of these three men were later identified as **FLEX** and **JEFE**.[4] As CW-2 parked his/her car, the three males came over to him/her and invited him/her to "take a little walk."

11.   CW-2 thereafter followed the three men to the rear of the Market Basket. During the walk, **FLEX** grabbed the front of CW-2's shirt in an apparent effort to see if CW-2 was wearing recording equipment.  The three men then grabbed their own shirts to demonstrate to CW-2 that they also had nothing on them.

---

4 To date, the third individual has not been identified.

12.  CW-2, **FLEX** and **JEFE** then had a discussion. **FLEX** told CW-2 that they had a "duffle bag" of guns to sell and could do deals by the "bundle," **JEFE** told CW-2, "Whatever you need it doesn't matter" and stated that he could make deliveries every day.  **FLEX** also told CW-2 "we don't know what you are trying to do with the blicks [guns] and we don't care what you are trying to do with the blicks.  We care about money."[5]  **FLEX** also acknowledged that the $700 had been deposited into "**KAE-KAE**"'s account, told CW-2 that they take care of **KAE-KAE** "good" and told CW-2 that he/she would be getting a gun for making that deposit and advised that they would be meeting in 20 minutes in another location so that the delivery could be made.  The three men then separated and CW-2 returned to his/her car.

13. **FLEX** thereafter directed CW-2 to the Crown Fried Chicken Restaurant at the intersection of Lakeview and Fisher Streets in Lowell, where CW-2 arrived at approximately 6pm. Once parked at that location, a young Hispanic male wearing a white hat and who identified himself only as "Ice" (who has never been identified and was not one of the three men who CW-2 had met at the Market Basket) got into CW-2's car carrying a

---

5 Both FLEX and JEFE regularly referred to guns as "Blicks" and told CW-2 they heard CW-2 was moving guns to the Dominican Republic and stated they "wanted in" and would feed CW-2 with whatever he/she needed.

7

black North Face backpack that the male opened and removed a firearm that he gave to CW-2. CW-2 inspected the gun and asked why it did not contain any ammunition. Ice told CW-2 that he would have to talk to his boy and that they would make it up to CW-2 later.

14. The male then got out of the car. Once he was gone, CW-2 advised me that the deal was complete and that CW-2 would be driving back to the staging area.

15. CW-2 was then followed back to the staging area where he/she and the UC car were searched and he/she turned over a SCCY Industries Model CPX-1 9mm semiautomatic handgun that was unloaded and had an obliterated serial number and the unused $700 in ATF funds.

   C. *BUY 2*--<u>The September 14, 2017 purchase of a Ruger Model LC-9 9mm semiautomatic hand gun that had an obliterated serial number and three magazines and 50 Rounds of 9mm ammunition from FLEX and JEFE</u>

16. I next met with CW-2 the following day to set up another gun buy from **FLEX** and **JEFE**. CW-2 advised that he/she had spoken with **FLEX** who was willing to sell CW-2 ammunition and a 9mm semiautomatic pistol with a laser sight and an extended magazine for $1000 and wished to meet at the Market Basket at 11 Wood Street in Lowell.

17. In anticipation of the buy, CW-2 was provided with recording equipment, an undercover vehicle with additional recording devices, and $1000 in ATF funds with which to buy the gun. After the undercover vehicle and CW-2 had been searched, CW-2 was followed as he/she left the staging area at approximately 3:38pm.

18. CW-2 got to 11 Wood Street approximately 10 minutes later and parked. Shortly thereafter, two men (who were with CW-2 at the Market Basket the day before and were later identified as **FLEX** and **JEFE**) approached CW-2's car, with **FLEX** (**TORRES-ALMANZAR**) entering the front passenger seat and **JEFE** (**VALENTIN**) getting in the rear. **JEFE** told CW-2 that he wanted to talk about timing and prices. **FLEX** then put a black North Face backpack on the floor in front of him and pulled out a white bag that he handed to CW-2. The bag contained a black firearm with a laser sight, four magazines (including one that **FLEX** and **JEFE** described as an extended one), and a large number of 9mm rounds of ammunition. **FLEX** and **JEFE** also showed CW-2 how to operate the laser sight.

19. After inspecting the firearm and ammunition, CW-2 gave **FLEX** the $1000 in ATF buy money that **FLEX** proceeded to hand off to **JEFE** in the back seat so that **JEFE** could count it.

9

20. CW-2, **FLEX,** and **JEFE** then talked about future gun purchases. **FLEX** and **JEFE** told CW-2 that "we do business and will take care of you" and assured him/her that, they had the supply to do whatever needed to be done. They told CW-2 that they were in the business of "growing our organization" and said **"KAE-KAE"** (who **FLEX** and **JEFE** described as "my dog") doing "just that while he is locked up." They told CW-2 that it was a "good thing that he [**KAE-KAE**] introduced us**."** Both men also advised CW-2 that they were armed and lifted up their shirts to expose a black firearm that CW-2 saw in **FLEX'**s waistband. **FLEX** assured CW-2 that he and **JEFE** had "plenty of 'em."

21. **FLEX** and **JEFE** also discussed the prices on future gun purchases and discussed doing a 3-gun deal for $2400. CW-2 wanted to know if he/she could get a "deal." Specifically, **FLEX** and **JEFE** told CW-2 that .380s cost $700, 9mm's cost $700-900, and .40's cost $1000. **JEFE** told CW-2 that they would sell CW-2 three 9mm guns for $2400 and assured him/her that each gun would come with an extra clip and told him/her that, if they came across an extra clip, they would throw it in because you are "our client." **FLEX** then followed up by assuring CW-2 that "when we do business, my nigger, we take care of you." They also told CW-2, "we can meet in Lawrence, we can meet in Lowell, we got soldiers on both cities."

22. Once their conversation ended, **FLEX** and **JEFE** got out of CW-2's car and left the area. CW-2 then let me know that the deal was done and, at approximately at 4:53pm, was escorted back to the staging area where CW-2 and the undercover car were searched and turned over a black Ruger Model LC9-S 9mm semi-automatic handgun with an obliterated serial number and a laser sight, four magazines, and 50 rounds of 9mm ammunition.

D. *BUY 3*--**The September 19, 2017 purchase of 3 firearms and 50 rounds of 9mm ammunition from FLEX and JEFE**

23. We next met with CW-2 on September 19, 2017 to purchase more guns from **FLEX** and **JEFE**. On that date, CW-2 advised that he/she had been in contact with **FLEX** who CW-2 had identified as **BRYAN TORRES-ALMAZAR** from a Lawrence PD booking photo on September 15 and whose identification was confirmed from video taken during various buys.[6]

24. CW-2 advised me that he/she had spoken with **FLEX** at (603)718-4267 in order to arrange the next firearm purchase. CW-2 further reported that **FLEX** was prepared to sell CW-2 3 9mm semi-automatic pistols for $2400 and wished to meet in the parking lot of the Brunswick Zone at 647 Pawtucket Avenue in Lowell. Accordingly, we prepared CW-2 by searching him/her and

---

6 Five days later, CW-2 identified JEFE as ERIC JOSE VALENTIN from a RMV photo and his identification has been confirmed from various videos captured during the gun buys.

11

the undercover car and by providing him/her with an undercover car equipped with audio and video recorders and $2400 in ATF funds with which to make the proposed 3-gun purchase.

25. While still in the staging area, CW-2 received a call from **FLEX** changing the location of the meet to 50 Pleasant Street in Dracut because **FLEX** had observed police cars in the area of the meet location.[7] Once these preparations were made and the new location disseminated, CW-2 was followed as he/she left the staging area at 4:32pm.

26. CW-2 arrived at 50 Pleasant Street shortly before 5pm and parked.  Several minutes later, **FLEX** and **JEFE** approached the car and got in (**FLEX** in the front and **JEFE** in the rear). **FLEX** proceeded to give CW-2 a blue plastic zip-up container that contained three semi-automatic pistols, multiple magazines, and numerous rounds of ammunition.  While inspecting these items and determining that they were real, both **FLEX** and **JEFE** showed CW-2 the guns they were carrying in their waistbands that were believed to .45 caliber semi-automatic pistols.  Once satisfied

---

[7] Based on my training and experience I am aware that gun and drug dealers will frequently change the location of a meet at the last minute in the hopes that it will either frustrate surveillance or allow them to see if their buyer is being followed.

that the guns provided by **FLEX** were real, CW-2 handed **FLEX** the $2400 in ATF buy money that **FLEX** then handed back to **JEFE**.

27. While **FLEX** and **JEFE** were in CW-2's car, they had some additional conversation with CW-2. **FLEX** and **JEFE** told CW-2 that they were "partners" and would be changing their telephone numbers but that, before they did, they would tell CW-2 because he/she was one of their "finest clients." When the CW asked **FLEX** and **JEFE** how they remove the serial numbers to all the guns, they told him/her that they had "a method" and told CW-2 to leave that "to us." **FLEX** and **JEFE** also made several references to a "Smith & Wesson" (one of the three guns CW-2 provided to me shortly after the buy) and the distinctive sound of a gun being racked can be heard several times as the video showed CW-2 inspecting them. In addition, CW-2 was also told that he/she was getting "extra clips" and the guns were "all ninas" (i.e., all 9-millimeter guns). **FLEX** and **JEFE** said that they could get CW-2 a "baby AR" that they would charge him/her $2400 (for which CW-2 would also get ammunition, clips and a small .25 caliber pistol) and could also get CW-2 "Manteca."[8] **JEFE** also instructed CW-2 to wear gloves whenever he/she was handling the Ruger they had previously sold him. **JEFE** advised

---

[8] Based on my training and experience, I am aware that "Manteca" is a common street term for heroin taken from Spanish slang.

CW-2 that the guns were not "dirty." **FLEX** and **JEFE** explained that they "got soldiers" and told CW-2 that if he/she had "any licks that we gotta hit" (based on my training and experience, I know that the term "licks" is a reference to a robbery) or any "bugs y'all niggas need wiped out" they could take care of it because they "wipe niggas out" and told CW-2 that they would start sending runners to meet him/her and stated that they were from Lawrence.

28. Once **FLEX** and **JEFE** got out of CW-2's car and left the area, CW-2 called to tell me that the deal was complete. CW-2 was then escorted to the staging area, where he/she and the UC Vehicle were searched and CW-2 gave me the following three guns that he/she had just purchased from **FLEX** and **JEFE**: (i) a Smith & Wesson Model SD9-VE 9mm semiautomatic pistol with an obliterated serial number; (ii) a Taurus Model PT-709 semiautomatic pistol with an obliterated serial number; and, (iii) a Taurus PT-111 Millennium G2 9mm semiautomatic pistol with an obliterated serial number. Also retrieved from CW-2 were three Smith & Wesson SD9 9mm magazines, 2 Taurus PT-709 9mm magazines, 2 Taurus PT-111 9mm magazines and 50 rounds of 9mm ammunition (all of which were provided by **FLEX** and **JEFE** as part of the deal).

14

**E. Three additional gun sales made by FLEX and JEFE to CW-2 between September 28 and October 19, 2017**

29.  Over the next three weeks, CW-2 made three additional controlled purchases of firearms from **FLEX** and **JEFE**.  As with the three sales that preceded them that are discussed above, each buy was set up with a telephone conversation and/or texts between CW-2 and either **FLEX** or **JEFE** in which the men arranged for **FLEX** and **JEFE** to sell CW-2 more firearms.  Once these arrangements had been made, CW-2 and the UC car were searched, provided with audio and video recording equipment and an undercover vehicle similarly equipped, ATF buy money with which to make the purchases, and was surveilled to the meet location.  CW-2 then met **FLEX** and **JEFE** at locations designated by them where **FLEX** and **JEFE** sold CW-2 various firearms and ammunition for the amounts described below. Immediately after these buys were completed, CW-2 was followed back to the staging area where he/she turned over the firearm and ammunition (if any) he/she had purchased and all the recording and monitoring equipment.  CW-2 and the undercover car were then searched and CW-2 was debriefed as to what had happened during the time that he/she was with **FLEX** and **JEFE**.

30.  **The September 28 buy.**  The first of these buys took place on September 28, 2017 when CW-2 met **FLEX** and **JEFE** at 647

15

Pawtucket Road in Lowell and purchased a Cobray M12, .380-caliber pistol with an obliterated serial number, a barrel extension, and 98 rounds of .380 ammunition for $2400.  During the buy, **FLEX** and **JEFE** told CW-2 that the gun was "fully automatic" (i.e., functions as a machine gun) and showed CW-2 how the gun operates.[9]  **FLEX** and **JEFE** also told CW-2 that they had "a lot of shells" and said the gun "holds 20."  CW-2 told **FLEX** and **JEFE** he/she had been talking to his/her "man" (described as the "nigger with the bread") who he/she said was going to like that but also told them that his/her man was in "a feud" thereby suggesting that his/her customer was buying the gun in order to use it.  In response, **FLEX** told CW-2 that he knew "exactly what CW-2 was doing" and said, "whatever you're doing, bro got nothing to do with me." **FLEX** and **JEFE** also told CW-2 that they were interested in selling him/her up to 70 grams of "Manteca" (that, as already noted, I know to be a street term for heroin) for the same price that CW-2 said he/she was currently paying for 62 grams, referring to themselves as a "one top goal organization" that had soldiers to go whenever needed.

---

9   This firearm was sent to the ATF Lab to determine if it qualifies as a machine gun under 26 U.S.C. §5845(a)-(b).  It does not.

16

31. **The October 4 buy.** On October 4, 2017, CW-2 met with **FLEX** and **JEFE** at 1734 Lakewood Avenue in Dracut and purchased the following three guns for $2400 in ATF buy money: (i) a Smith & Wesson Model SD9-VE 9mm semi-automatic pistol with obliterated serial number; (ii) a Glock G38 Gen 3 .45 caliber semi-automatic pistol with an obliterated serial number; and, (iii) a Hi-Point Model JHP .45 caliber semi-automatic pistol with an obliterated serial number. Also included in the sale were 3 additional magazines and 58 rounds of .45 caliber ammunition (the included "hollows"). During this buy, **FLEX** and **JEFE** again confirmed their willingness to sell CW-2 heroin and provided CW-2 with the following price list for future gun purchases:

```
.22/.25/Revolvers = Negotiable
9mm/.380 = $800 = Firm!
.40/.45 = $1,000 = Firm!
Glizzy 9mm/.380 = $1,000 = Firm!
Glizzy .40/.45 = $1,400 = Firm!
Small yoppa = $2,400 = (Negotiable)!
Yoppa = $3,000 = (Negotiable)!

                        Green beam = 350
All includes            Red beam = 250
Food plus
extras
```

**JEFE** also told CW-2 that he had almost taken his leg off while getting the guns ready and showed CW-2 the wound to his leg. **JEFE** and **FLEX** also offered to sell CW-2 three "Glizzys" (a street term for guns manufactured by Glock) for $4000.

32. **The October 19 buy.** The final buy made from **FLEX** and **JEFE** took place on October 19, 2017 when CW-2 met with **FLEX** and **JEFE** at 50 Pleasant Street in Dracut and purchased the following two guns for $3400 in ATF buy money: a Jager AP80 .22 caliber rifle with an obliterated serial number and a high capacity magazine that **JEFE** brought into CW-2's car in a cardboard box; and a Smith & Wesson Model M&P 40 Shield .40 caliber semiautomatic pistol with an obliterated serial number provided by **FLEX**.

33. After the buy was completed and the $3400 paid, **FLEX** and **JEFE** criticized CW-2 for being unresponsive and not following proper "business ethics." They told CW-2 that they were running a business and sold to people who they view as clients and from whom they expect loyalty. They indicated that they had had an AR rifle ready for CW-2 and were willing to add a small gun for the same price but he/she had ignored their calls. They explained that they regularly received shipments in crates and would be able to sell whatever they received. They emphasized that communication was the key to a good relationship

18

and it was important for CW-2 to communicate with them as to what he/she wanted and when. They also acknowledged to CW-2 that they were members of the Latin Gangsta' Disciples gang (that they also referred to as "LGD" and "Latin Folk") and **JEFE** displayed what he claimed was an LGD tattoo on the inside of his upper arm. They stated that they receive crates of guns and indicated that they would be waiting for a call from CW-2 as to selling him/her both more guns and heroin.

34. After each of the purchases made from **FLEX** and **JEFE** that are described above, I personally inspected all of the firearms purchased and determined, based on my training and experience, that they were firearms within the meaning of 18 U.S.C. §921(a)(3). With the exception of the Cobray M12 pistol purchased on September 28 (which, as set forth above was sent to the ATF Lab to determine if it meets the definition of a machine gun contained in 26 U.S.C. §5845(a)-(b)[which it does not]) all of the guns have been sent them to the Massachusetts State Police Ballistics Unit so they could be test fired by the Ballistics Unit. To date, five of the firearms have been successfully test fired (with the other guns in process).

35. On November 2017, the Federal Licensing System, an ATF database that lists all current federally licensed firearms dealers, was queried and revealed that none of the Targets (**JOSE**

19

**ILARRAZA, A/K/A "KAE-KAE," BRYAN TORRES-ALMANZAR, A/K/A "FLEX,"** and **ERIC VALENTIN, A/K/A "JEFFE"** possess a Federal Firearms License to sell firearms.

36. Based on the foregoing, there is probable cause to believe that during the months of September and October, 2017, **JOSE ILARRAZA, A/K/A "KAE-KAE," BRYAN TORRES-ALMANZAR, A/K/A "FLEX,"** and **ERIC VALENTIN, A/K/A "JEFFE"**, individuals who do not possess a Federal Firearms License to sell firearms, engaged in the business of selling firearms in violation of Title 18, United States Code, Section 922(a)(1)(A), Aided and Abetted, in violation of Title 18, United States Code, Section 2 and conspired to deal in firearms without a license in violation of 18 U.S.C. §371.

_____
PETER MILLIGAN
Special Agent
U.S. Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn and subscribed to me this __31__ day of January 2018.

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

20